I'd like to use my time today to discuss two issues that are raised in the government's mind. First, the trial court's erroneous reliance upon the plaintiff's depiction of the manner in which fuel would have been accepted, rather than the undisputed proof of what would have happened. And second, the award of damages for so-called generic NRC fees, in the absence of proof that these fees were attributable to DOE's breach, and in the absence of proof of what those fees would have been in the absence of DOE's breach. Turning first to the issue of the sequence in which spent fuel would have been accepted. I had trouble understanding the briefs on this issue, and obviously because of the breach, the government didn't take fuel from either Unit 1 or Unit 2, so something had to be done to store both of them. Is the contention here that, depending on which unit was taken first, that the increased storage costs would have been less or more, is that the point? Yes, Your Honor. And what matters is which fuel would have gone out first. And the reason for that is that part of Entergy's claim includes the cost to make- Because of the breach, they had to store both fuels. Right, Your Honor. And the $89 million or so worth of damages that are not in dispute relate to the taking the fuel out of the Unit 1 and Unit 2 spent fuel pools, and putting it in dry concrete storage for the time being. So explain to us why it would have made a difference in terms of the mitigation costs for the breach, depending on whether they took one unit or the other unit first. Because in addition to the $89 million, there are approximately $7 million that consist of the cost to maintain the Unit 1 spent fuel pool until all of the fuel was removed from that pool and brought out to dry storage. So for a period of years, from 1998 up until approximately 2006 or 2007, the fuel in the Unit 1 pool remained there. And as a result, Entergy incurred costs to operate the pool, to run the filters, run the water, keep the fuel in the pool and keep it safe. Now Entergy's contention at trial was that none of those costs would have been necessary after 1998, because in the non-breach world, all of that fuel would have been taken out in 1998, such that by the time Entergy purchased the plant in 2001, it wouldn't have had to spend any more money on a Unit 1 pool. So but under their theory, there would have been additional dry storage costs, right? No, Your Honor. No, why not? Because the cost to put the fuel in dry storage would have been thin. For the most part, I suppose it's conceivable that there would be a small amount of additional damage or additional costs associated with having fuel in dry storage. But dry storage is a passive system, if you will. Basically the fuel's out there, it sits in the cold, it sits outside. There are obviously safeguards and technological issues that need to be addressed to do that. But it's far less labor-intensive, expenditure-intensive than having it in a pool where there's water flowing in, flowing out, and keeping the fuel cool. So there's $70 million or so in expenditures that relate to having that fuel in the pool beyond 1998. Now Entergy's contention at trial, and the only contention at trial, based upon the report prepared by a damages expert, was that all of that fuel would have been removed in 1998, such that it wouldn't have had to spend a single dollar to operate the spent fuel pool after 1998. Now the problem with that is that there was no proof in the record to support that result. In fact, all of the proof about what would have happened in the absence of DOE's breach was that the Unit 2 fuel would have been removed first, meaning that Entergy would have chosen to make space available in its Unit 2 pool, where the Unit 2 plant is continuing to run and continuing to have a need for additional space in the pool. So Entergy contested and wanted to get all the fuel out of Unit 2 first, and in the non-breach world, its representative, Dr. Garone, testified that it would have preferred, for that reason, that Unit 2 fuel be removed first. Now what the trial court held, and where the trial court went wrong... And if they took the Unit 2 fuel out first, they would have had the same expenses to maintain Unit 1. If they took the Unit 2 fuel out first, they would have had the same expenses. That's your contention. Yes, Your Honor. And the trial court went wrong by simply saying, well, we can redepict, or Entergy has the right to redepict what would have happened in the non-breach world based upon its own current preferences, rather than based on facts that are actually tethered to the preferences of the person who owned the plant. What do we look to to determine the reasonableness of a hypothetical but-for-world scenario? Clearly, Your Honor, no one knows for certain what would have happened, but absolute certainty is not required, and we can look to objective facts, testimony in the record, documentary evidence in the record about what would have happened. And in this case, we happen to be lucky. We have a situation where, without any rebuttal, any cross-examination, the decision-maker, the person in charge of the program, Dr. Garone, testified that it would have been his preference that when DOE arrived in 1998, that fuel should be removed from Unit 2 first, and that Entergy... And that would have all been done before the takeover. Yes, Your Honor. Entergy had no authority any more than anyone in this courtroom to dictate what would have happened in the non-breach world up until the time that it actually purchased the plant. What did the Court of Claims say? It didn't question whether or not what Con Ed would have done. It just looked at what Entergy would have done if it had been in charge. Is that where it went astray, in your view? I think that's a fair statement, Your Honor. What it said is that Entergy's, and this is on page 839 of the record, it said Entergy's preferences have as much rationality as Con Edison's preferences, and therefore we can just look to what Entergy says would be the more reasonable approach. But it's not simply a question of what's plausible in the abstract. The question is what scenario is, in fact, most likely to have occurred. And we see this in the Blue Bond, the Windstar cases and cases like that, where the court requires a plaintiff depicting a non-breach world to actually tether its claim to reality. And to the extent it doesn't, to the extent it makes unrealistic assumptions about what would have happened, it can't face a damages award upon that scenario. But the delivery commitment schedules that were submitted were, first of all, not binding, and second of all, somewhat equivocal. Isn't that right? Your Honor, they were not binding. I agree with that. There's an option to change. But they reflected the preference of Con Edison as testified to by Dr. Garone. And there's no testimony in the record suggesting that at any point in time, Con Edison would have changed its mind or would have exercised some kind of option to switch. But is that preference, should that preference be determinative when it's simply an expressed preference? In the absence of proof suggesting otherwise, absolutely, Your Honor. Entergy had an opportunity to put on a witness to extract from Dr. Garone some kind of admission that, well, it was planning on changing its mind or something like that. But the testimony in pages A133 and A140 are unrebutted. The question posed to Dr. Garone was, from which pool, if DOE had arrived in 1998, would Con Edison have requested that fuel be accepted? He said, without qualification, without a suggestion that we might change our mind, that Con Edison would have elected that Unit 2 fuel be removed first. And there's no proof to the contrary. Now, on appeal for the first time, Entergy argues that, well, maybe the government's right. And if it is right, then we should still have an opportunity to present an alternate scenario of what might have happened. But the problem with that, Your Honor, is that they didn't make such an assertion in trial. At no point in time, during discovery or a trial, they ever suggested that the fuel would have been removed from Unit 1 at any time other than 1998. Before your time runs out, can I just shift here, if you're finished answering Judge Lynn's question, to the NRC use of fee? In Boston Ed, the government never appealed the causation issue with respect to fees, right? That's correct, Your Honor. Now, here, you're arguing in the alternative, it seems to me, on appeal, that even if there's some causation, what we've got, in your view, would we have to remand it in order to apportion the correct amount of damages between wet and dry storage? I think it's one step further than that. I think reversal of the entire award is warranted. The specific issue that we've raised with respect to the calculation of damages is different than the one that was raised in Boston Edison, where the court did remand the issue. But here, we're talking about a wholesale failure to account for a cost that would have been incurred in the non-breach world. And by that, I'm referring to the wet storage component of the spent fuel storage fee assessed by the NRC. Mr. Metcalfe acknowledged that he included within his damage claim not only the cost that were… I don't understand. You started off by responding to me by saying it's an outright reversal. It seems to me that what portion of the fee is attributable to wet versus dry storage is a different issue. Now, you're saying that it's an outright reversal because even if causation were met and you were obligated to pay for some of the fees because they haven't shown an apportionment, then they lose automatically without a remand? I think, Your Honor, that's the consequence of a failure to meet a burden of proof. And that's the nature of the argument right here. But there's a predicate argument about the causation. Are you still arguing a lack of causation? Absolutely, Your Honor. And these are two prongs of our attack. I'm happy to address either one first. Perhaps I'll briefly allude to the damages side of things. Why don't you start with the causation? Okay. I can do that too. With regard to causation… The problem, as I see it, is that we have these official NRC documents which were published in the Federal Register. And those NRC documents don't really tell us whether the fee structure was changed, whether the generic fees increased as a result of the government's briefs, right? They don't say one way or the other. I don't think that's accurate, Your Honor. And I'm looking at 64 Federal Register 15876. This is the April 1, 1999 proposed rule articulated by the Federal Circuit. And on page 15881 and 15882, the NRC specifically articulated what the three concerns were as to why it is that it was changing the rule. It mentioned, one, the fee structure could create a disincentive for licensees to pursue dry storage. Two, the fairness of assessing multiple annual fees if a licensee holds multiple ICCI licenses for different designs. And C, not all affected licensees are being assessed the cost of the NRC's generic decommissioning activities. Those are the three reasons that the NRC mentioned in the Federal Register as part of the proposed rule. The Federal Register is what is required to be – is the site in which… It doesn't really address the question of whether the generic fees increase as a result of the government's briefs. There are two separate issues here. One, who's going to pay the fees? What's the structure for the payment fee? The other one is are the fees increasing as a result of the government's briefs? And it seems to me that while you're correct that they address the first question, that is, how are we going to assess the fees? Who's going to pay them? And they give the reasons for that. They really don't address the second question, and that is whether the generic fees increase. The costs incurred by the NRC increased as a result of the government's briefs. No? I mean, where do they address that? Your Honor, you're correct that that's not specifically addressed, but again, that's part of the plaintiff's burden of proof. And there's no proof whatsoever about the extent to which any increase occurred in the generic fees associated with dispensable storage as a result of DOE's briefs. Why don't you guys ask the NRC whether the fees increased as a result of the government's briefs? I mean, there must be some sort of declaratory judgment procedure before the NRC, isn't there? I'm not aware that there's a procedure. I am aware that the plaintiffs have the burden of proof with respect to this issue. And, you know, I think it's noteworthy, too, and I see that I'm well into my— Well, we'll give you a little more time to answer Judge Dyke's question and then Judge Proulx's question. Thank you, Your Honor. The—sorry, I lost my train of thought momentarily. You were saying that there's no nexus, that there's no proof at all. I guess I've got a question, though. I mean, at least the Court of Claims referred to various statements in the record, Commissioner Merrifield and other stuff that's in the record. So I guess I kind of dispute the fact that you say there was absolutely no evidence in the record. Well, those—I'm sorry, Your Honor. Those statements are equivocal at best as to what the reason for the change in policy was. But among other things, they are the statements of two out of five NRC commissioners and don't reflect anything like the formal policy statement issued in the Federal Register. The second point— But the formal policy statement doesn't tell us the answer to the question. I agree with you. I don't—it strikes me as very strange to put NRC staff members or former staff members on the stand to tell us what the agency is doing. They can't do that. We've addressed that before in the Rumsfeld case. You've got to get an official statement from the agency. So why don't we get an official statement from the agency as to—they must know whether the fees increased as a result of the breach or not. Why don't we ask you guys to ask the NRC to answer the question? I think that falls within the category of the plaintiff's burden. And the other point I want to make clear is that to the extent that there is a perception that the need for regulation increased as a result of the increased amount of dry storage that became necessary due to the DOE's breach, that increase is reflected in the increase in Part 170 fees, meaning these fees— Sure, but the generic—it's at least theoretically conceivable that the generic fees could have increased as a result of the breach as well, right, even though they're not plant-specific. I suppose it's conceivable, yes, Your Honor. We don't come to the point where we're simply weighing whether it's conceivable. We're weighing the question of whether or not they've sustained a burden of proof. And in our view, the plaintiffs have not sustained a burden of proof by simply coming to the court and suggesting through common sense or something to that effect that there was such an increase. With respect to the issue of calculating the damages— Briefly. Briefly. Did you raise this point before the Court of Claims? Did you make an argument that they had sufficiently demonstrated that there was, you know, some of this need for wet storage rather than just the dry storage? Yes, Your Honor. We addressed both the causation issue as well as the reasonable certainty issue. And the reasonable certainty issue that we raised concerned the fact that even though the plaintiffs had attempted to isolate solely the spent fuel storage costs that were assessed by the NRC, it included within its damages claim not only the dry storage component but the wet storage component of that spent fuel storage fee. And we specifically asked Mr. Metcalf whether or not he had made any effort to back out the portion of the cost that he acknowledged would have been incurred in the non-breach will. And he answered—this is on page 1979 of the appendix—that he had not. And for that reason, Your Honor, it's our view that they failed to meet their burden of proof. And therefore, with respect not only to the Unit 1, Unit 2 issue, but also with respect to the NRC issue, that the award of damages should be reversed. All right. Thank you very much. We'll restore your three minutes of rebuttal. Mr. Tomachek, we'll give you an additional four minutes. Thank you, Your Honor. May it please the Court, I appear here today for Entergy or ENIP as it's known. The government appeals two adverse findings of fact by the trial court, but in neither instance has the government met the clearly erroneous standard required for a reversal. With respect to this first issue about the Unit 1, Unit 2, in the non-breach world, if Connie had decided to have the Unit 2 stuff go out first, that would have been completed before ENERGY took over, correct? If Con Ed had ultimately submitted a final delivery schedule, which were approved, and that final delivery schedule contemplated Unit 2 fuel, yes. No, no, that's not an answer to my question. My question is, based on what Con Ed's expressed preference, we assume that that is the only evidence as to what would have happened in the non-breach world. They expressed a preference to have the Unit 2 stuff removed first. If that preference had been followed, that would have occurred before ENERGY took over in 2001, correct? Your Honor, I'd have to disagree with that stated supposition. You can do that, but I'm asking you a hypothetical question. Let's assume that we decide that the Con Ed preference would have been implemented in the non-breach world. Accept that. I know you disagree with it, but accept it. That would have happened, would it not, before the ENERGY takeover in 2001? Yes. The reason I am troubled by the question, Your Honor, is because the trial court actually heard testimony in this case from not one, not two, but three witnesses from ENERGY, all of whom were involved in the operations of the plant, Mr. Mayer, Mr. English, and Mr. Henrichs. And the latter two were both Con Ed employees. And they specifically testified, contrary to what Dr. Garone testified, and not mentioned by the government, is that ENEP would have moved fuel out of the Unit 1 pool first. And that's in the appendix at 1537 for Mr. Mayer, 1564 for Mr. English, and 17... I'm sorry, 15... And period of operation? Yes. They were asked those questions. We recognized that we were under an obligation to establish this but-for world. And those three witnesses all testified that in the but-for world they would have moved the Unit 1 fuel first. Not they, not ENERGY, but Con Ed would have. Correct. And two out of the three of the gentlemen were actually employees... Tell us an example of such testimony. I'm in the appendix at page A, 1531, and I'm reading the answer of Mr. Mayer.  I'm in the transcript, Your Honor. It's appendix page A, 1531. It's the transcript at 3747, starting at line 18, and this is the answer of Mr. Mayer. Well, the highest priority for us was ultimately draining the pool for the purpose of stopping leakage of contaminated water into the ground and ultimately into the groundwater on the site. So that was really the project goal, and in order to accomplish that goal I had to get the fuel out. But that sounds as though he's talking about what happened after ENERGY took over rather than what Con Ed would have done if it had operated the plant. Then let me turn, Your Honor, to the testimony of Mr. English, the next gentleman whom I refer to in the appendix at page A, 1564, specifically in the transcript, Your Honor, at page 3879. Question starting at line 3. 1764 or 1734? I'm sorry, Your Honor, I misspoke. It's the appendix at 1564. 1564. Yes, sir. I'm sorry. And I'm at page 3879 of the trial transcript, starting in the upper left-hand corner on that page, starting with the question at line 3. Suppose DOE had removed the fuel from Unit 1 beginning in 1998. What effect, if any, would that have had on the Unit 1 pool leakage? We would have drained the pools at that time and there wouldn't have been any more leakage. He's not saying that they would have changed their preference there. Where does somebody say that this testimony by the former Con Ed executive that they would have removed the fuel first from Unit 2 was wrong and that they would have done something different? And then let me turn, finally, and these are just snippets, Your Honor, but let me turn again to the transcript, the appendix at page A, 1746, page 43, 42, starting with the question at line 8. Question. Based on the fact that it was believed that the curtain drain system at Unit 1 was collecting all of the Unit 1 water, it's not correct to say that the belief was that the Unit 2 fuel should go first because of the leak, correct? And this is Mr. Hendrick's answer. Well, my position is, as is the Unit 1 manager, was to take care of Unit 1-related issues. And knowing that the pool leaked, we had fuel in the pool, I believe that was the right thing to do first. He worked for you all along for Con Ed, didn't he? He previously worked for Con Ed. Can I ask, just all of your answers, and you're trying to find this stuff in the transcript, but you hang your hat on what the Court of Claims thought. And as I read the Court of Claims, the Court of Claims wasn't relying on testimony as to what they would have done. The Court of Claims just said, we're not going to bind ENIP to statements made by Con Ed. So your argument to Judge Dyke seems different than what the Court of Claims actually found. They said, no, we agree with what Con Ed's preference was, we just don't think we ought to, as a matter of law, I guess, bind ENIP. And how do you justify that contribution? Well, I think there's a couple of reasons for that. Number one, the DCSs, the Delivery Commitment Schedules, were not binding on Con Ed. They were planning documents. The only testimony in the record is the submission of the DCS forms, and notably, in each instance, Con Ed specifically reserved the right to change from Unit 2 to Unit 1 fuel allocations. But those things certainly indicated a preference. They indicated the preference at the time they submitted the DCSs, starting in the early 1990s. And there's no evidence to the contrary? Your Honor, with all due respect, what we're talking about is the but-for world, the hypothetical world, and I would submit that the witnesses at ENIP, who testified at trial that I just briefly alluded to, in each instance indicated a preference to take the Unit 1 fuel first. And there was a reason for that, because the Court was leading. Fine, but that was after energy took over. The question is what would have happened in 1998, 1999, 2000, before energy took over, and the only testimony relating to that period of time is that Con Ed's preference was to have Unit 2 removed first, right? I respectfully can't disagree with that, Your Honor, because of the— Can't disagree? I'm sorry, I can't agree with that, Your Honor, because of the testimony that I just alluded to of the three energy witnesses. Yes, they're speaking about a hypothetical but-for world, but it was known as of 2000—certainly it was known in the 1990s that the pool was leaking. By somewhat later than that, it was known that this drain capture system wasn't working. So there was a compelling reason for any utility, any thoughtful utility that was operating the plant to want to get the fuel out of Unit 1, because it was leaking. Well, that's what you say. The problem is that the Con Ed guy who was in charge said that our preference was to get rid of Unit 2 first. And he did that based on non-binding delivery commitment schedules, which under the contract are then supposed to be replaced by final delivery schedules. We never got that far along because the entire program was suspended. I think it's also worth noting that the 1987 ACR, in a world in which DOE is performing, there's no problem at either side. There are plenty of allocations, and this is in the appendix. The 1987 ACR, Your Honor, is in the appendix starting at page 2576. And if you walk through, you can see a listing of allocations for either Con Ed Unit 1 or Unit 2. And in a world in which the Department of Energy is performing, there are plenty of allocations, and there's no problem at either side. There would have been no need for dry fuel storage. That's not the finding of the Court of Federal Claims. Well, I believe, Your Honor, the Court found specifically that there would have been no need for a dry fuel storage facility. And what the Court found was that because the DCS is— You got paid for the dry fuel storage facility, right? I'm sorry? You recovered the costs of the dry fuel storage facility. Well, we haven't yet, Your Honor. That's what this— No, but we've been awarded that, right? Well, we've been awarded those costs by the trial court in substantial part, but not entirely. What's at issue in this case are the O&M costs for the period of 2004 through 2008. Could we turn you to the NRC fees? Yes. There is no mention in any of these formal NRC documents that the method of allocating the fees was changed as a result of the breach. Is that correct? Well, I'm not sure, Your Honor, I can agree with that either, respectfully. I would note, first of all, that the final rule, not the preliminary rule that Mr. Auerbach cited to, but the final rule dated June 10, 1999, specifically alludes to, quote, the fact that DOE has not taken possession of the spent fuel. That seems to me to come pretty close to saying the reason we're changing this rule is because DOE has not taken possession of the spent fuel. That's in the appendix 2885. But is it not correct that the NRC hasn't said anything one way or the other as to whether the generic costs increased as a result of the government's breach? Your Honor, I think they've come pretty close to that, both in the final rule language that I just mentioned. You also have the contemporaneous comments of NRC Commissioner Merrifield, which are in the appendix at 2642. And most importantly, according to the trial court, and I'm quoting now from the trial court's decision, quote, these comments confirm the existence of a direct link between DOE's breach and the NRC's 1999 fee change. Why should we be sort of listening to after-the-fact testimony by a single commissioner or staff member as to what was going on? The NRC must know whether the generic fees increased as a result of the breach or not. Why don't you guys just answer that? Your Honor, I don't think it was after-the-fact. I think the comments, particularly of Commissioner Merrifield are— No, but the NRC can't speak for the agency. Only the agency can speak for itself. Why not just go and ask the agency whether the fees increased as a result of the breach and by how much? They have the records, which are not available to other people. Why not just ask them? Well, I would respectfully submit, Your Honor, that we took their published records and based on those published records by the government, the trial court specifically found a direct link between DOE's breach and the NRC's 1991 fee change. Mr. Auerbach says we didn't meet the burden of proof. I would respectfully submit that we did. Is there public information about the increase in generic fees from one year to another? I'm not sure I understand the question, Your Honor. Is the information as to the amount of the NRC generic fees publicly available information? It is published each year in the Federal Register. Okay, so what does the record show about the increase in the NRC fees? They publish a revised number, Your Honor. No, but I mean, did fees go up from 19—when was this change in allocation made? What year? In 1999. In 1999. Yes. Did the total fees go up from 1998 to 1999 and 2000? Your Honor, I don't know if our total fees went up, but what went up and what the trial court— Not your fees, the total of the NRC costs. The generic NRC fees went up to the tune of $2.1 million, which is what the trial court ordered. No, not for you, for total. The NRC total—did the Nuclear Regulatory Commission's fees go up? Did their costs go up during the period of the breach? I don't know whether their costs went up, Your Honor, but all I know is that for this particular client, they did not have dry fuel storage. The NRC implemented a fee change in 1999 and imposed on us for the first time a generic fee, which we had not previously paid. We did not have dry fuel storage at that time, and that was a new fee that we had not previously paid. So we can't tell from the record whether the NRC costs of generic regulatory activity increased before and after the breach? I think what the trial court observed is that as a result of increased need for dry fuel storage, that the NRC's fees or costs went up, and that as a result of those increased costs, that's why the NRC— Where does the record show that the costs went up? I believe what the trial court alluded to was the sharp rise in the number of dry storage facilities, that that placed additional workload responsibilities on the NRC, and that's in the appendix at page 50, Your Honor, 92 Fed Claim 514. You're well into your rebuttal. Do you want to save the rest? Yes, Your Honor, I would like to, unless there are further questions. Very good. Thank you. Mr. Averbach. Thank you, Your Honor. Very briefly, the counsel referred to the witnesses, the statement of three witnesses, who worked at either the Con Ed or Energi side of the plant between 1998 and 2008. We've addressed the statements of each of these witnesses at page 26 of our brief, explaining why it is that none of that testimony, which, by the way, Energi doesn't even rely on in its brief, is compelling. The closest counsel came, I think, to suggesting that the preference was different than something that Dr. Garone testified to, was the testimony he offered with respect to Mr. Heinrich, but in fact, we cite this in our brief on page 26. What counsel didn't read was the follow-up question. This is on page 1746 on the bottom right of the page, and the question was, and isn't it true that, in fact, the owner of Indian Point requested that Unit 2 spent fuel be accepted before Unit 1 fuel? Answer, that was the way most of the people felt their Unit 2 was an operating plant. Question, and wasn't Unit 2 running out of space? Answer, yes, it was, and it was running out of space in the late 1990s, right? Answer, well, it was filling up the Unit 2 fuel pool. Unit 2 was re-racked three times to add additional capacity. Your Honor, it's clear that the only testimony that the court could possibly have relied on was that of Dr. Garone. The only other point that I wanted to just be clear about, and Judge Dyke, I think, referred to this, to the extent that counsel is suggesting here that Enid's decision-making was influenced by the existence of a leak at the site. The facts are that Con Ed and Entergy believed that the leakage at the pool was contained, and the problems with the curtain drain system at Unit 1 were contained. It wasn't until 2005 and 2006 that Entergy realized, wait, there's a problem here. We now need to empty the Unit 1 fuel pool. Back in 1998, 1999, 2000, there was no sense of urgency with regard to that, and, in fact, the trial court specifically found on page 844, and I'm reading here on the bottom left, Con Ed and Entergy, as Indian Point's owners, thought they had contained the leaks and could confer any further treatment of them until it was the time of decommissioning. When Entergy happened to discover in 2005, in connection with Unit 2 plant modifications, that the leaks were not being contained, Entergy decided that site characterization work could not wait and needed to be performed immediately. What about the NRC fees? Is there evidence in the record? As I understand the legislation, NRC has to charge the regulated parties the cost that it incurs to engage in regulation. Does the record tell us whether the cost of generic regulation increased from the pre-breach period to the post-breach period? Not with respect to 171 fees, Your Honor. So this is a generic fee. Correct. It doesn't tell us one way or the other whether there was any increase at all. Correct. Thank you, Your Honor. Is there no further questions? Thank you. I'm sorry, Your Honor. No, no, go ahead. I thought I had 40 seconds or so. I don't think there were any comments on the cross-appeal, so I think there's nothing for you to say at this point. I just wanted to speak to the capital suspense loaders in our position was that the trial court... I think that's a little too late because your adversary doesn't have a chance to respond. Thank you very much. The case is submitted.